# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO. 21-CR-378 (TJK)** |
| | : | |
| ARTHUR JACKMAN, et al., | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT GEORGE'S MOTION TO TRANSFER VENUE

Defendant Edward George, Jr., who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Middle District of Florida, where neither he nor his counsel resides, allegedly because it would "be a more convenient location for some participants in the trial" and because he believes the jury pool there would be "less biased." ECF No. 196 ("Mot.") at 26-27. George fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court, following the D.C. Circuit's opinion in *United States v. Webster*, 102 F.4th 471, 479 (D.C. Cir. 2024), should deny his motion.[1] George attempts to avoid this inevitable conclusion by providing a study consisting

---

[1] In addition to the D.C. Circuit's opinion affirming the denial of a motion to transfer venue in *Webster,* judges in this district, including this Court, have denied motions for change of venue in dozens of January 6 prosecutions, and no judge has granted a change of venue in a January 6 case. *See, e.g., United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-12, ECF No. 114 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, No. 21-cr-687, ECF No. 78 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, ECF No. 52 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, ECF No. 62 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Gillespie*, No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Barnett*, No. 21-cr-38, ECF No. 90 (D.D.C. Nov. 23, 2022)

mostly of a media analysis performed by a company led by a convicted January 6 defendant. But as other judges in this district have recognized,[2] that analysis provides nothing that should disturb the conclusion that the D.C. Circuit, this Court, and judges across the district have consistently reached: that voir dire is the appropriate mechanism to detect jury bias, and that the jury pool is not so tainted by pretrial publicity that a venue transfer is necessary.

---

(CRC); *United States v. Bender, et al.*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Ballenger*, No. 21-719, ECF. No. 75 (D.D.C. Oct. 28, 2022) (JEB); *United States v. Eicher*, No. 22-cr-38, ECF No. 34 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Nassif*, No. 21-cr-421, ECF No. 42 (D.D.C. Sep. 12, 2022) (JDB); *United States v. Brock*, No. 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Jensen*, No. 21-cr-6, Minute Entry (D.D.C. Aug. 26, 2022) (TJK); *United States v. Seitz*, No. 21-cr-279, Minute Order (D.D.C. Aug. 17, 2022) (DLF); *United States v. Strand*, No. 21-cr-85, ECF No. 89 (D.D.C. Aug. 17, 2022) (CRC); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303, Minute Entry (D.D.C. July 21, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204, Minute Order (D.D.C. July 15, 2022) (BAH); *United States v. Calhoun*, No. 21-cr-116, Minute Order (D.D.C. July 11, 2022) (DLF); *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022) (APM); *United States v. Williams*, No. 21-cr-377, Minute Entry (D.D.C. June 10, 2022) (BAH); *United States v. McHugh*, No. 21-cr-453, Minute Entry (D.D.C. May 4, 2022) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. Apr. 29, 2022) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418, ECF No. 31 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158, Minute Order (D.D.C. Dec. 14, 2021) (RC); *United States v. Reffitt*, No. 21-cr-32, Minute Order (D.D.C. Oct. 15, 2021) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

[2] *See United States v. Johnson, et al.*, No. 21-cr-11, Minute Entry (D.D.C. Mar. 12, 2024) (RJL) (denying motion to transfer venue citing same media analysis raised here); *United States v. Purdy, et al.*, No. 22-cr-19, Minute Entry (D.D.C. May 30, 2024) (RCL) (same).

## **BACKGROUND**

George traveled from his home in Florida to Washington, D.C. and participated in the riot of January 6, 2021. George engaged in a physical confrontation with police outside the Senate Carriage Door, unsuccessfully trying to gain entry there, before ultimately entering the U.S. Capitol building illegally through the Rotunda Door. George made it to the Senate Gallery and stole an American flag from inside the building. He would later text a friend a photograph of himself and others on Capitol grounds and add, "We fought the cops" and "Fucking traitors."

Based on his actions at the U.S. Capitol on January 6, 2021, George has been charged with felony counts of civil disorder, in violation of 18 U.S.C. § 231(a)(3), and assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1), as well as several misdemeanors. *See* ECF No. 181.

George now moves to transfer venue to the Middle District of Florida, where he lived at the time of January 6, 2021, but no longer resides. *See* Mot. at 27-28; ECF No. 152 (pretrial compliance report reflecting residence in North Carolina). He contends that prejudice should be presumed in this district for several reasons: (1) the results of a media analysis (prepared by a company headed by a convicted January 6 defendant),[3] an analysis of Google Trends, and some information about implicit bias; (2) the characteristics of the D.C. jury pool; (3) the pretrial publicity surrounding the events of January 6; and (4) George's convenience. All the defendant's arguments are meritless. The Court should deny his motion accordingly.

---

[3] The Media Bias Analysis was prepared by Watchpost Analytics, whose CEO is Brad Rukstales. ECF No. 196-1 at 13. Rukstales pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) in connection with his conduct on January 6, 2021. *See United States v. Rukstales*, No. 21-cr-41 (CJN), ECF No. 90. Specifically, he admitted that he followed retreating officers into the Capitol Visitor's Center and threw chairs at them. *Id.* at 3-4.

**ARGUMENT**

In *Webster,* the D.C. Circuit affirmed the denial of a similar motion to change venue brought by a January 6 defendant – a high-profile defendant who was the first to go to trial for assaulting an officer that day. *Webster*, 102 F.4th at 479. Webster, who relied on many of the same arguments that George raises here, failed to "clear that very high bar" to establish the presumption of prejudice that would require a court to transfer venue. *Id.* Specifically, the D.C. Circuit found that the District of Columbia's high rates of voting for Democratic Party candidates, the size and structure of the District of Columbia's jury pool, and a pretrial poll showing that D.C. residents had a negative impression of participants in the January 6 attack did not establish prejudice. *Id.* at 479-80. The panel further observed, "[t]he record lacks any evidence of pervasive (or much of any) media coverage aimed at Webster and his conduct," finding the results of a Google search for Webster's name and the limited number of newspaper articles about his case insufficient. *Id.* at 479. *Webster* forecloses many of George's arguments here, and none of the George's remaining points is sufficient to establish the kind of prejudice needed to grant a motion to change venue.

## I.     Legal standard.

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. "So when 'extraordinary local prejudice' prevents impartiality, courts must transfer the trial to a location where an impartial jury can be drawn." *Webster*, 102 4th at 479 (citing *Skilling v. United States*, 561 U.S. 358, 378 (2010)). "Prejudice across an entire jury pool can be presumed only in the extreme case, where prejudicial publicity so poisoned the proceedings that it was impossible for the accused to receive a fair trial

by an impartial jury." *Id.* (citations omitted).  "The Supreme Court has found presumptive prejudice in only the rare case where a jury pool was so 'pervasively exposed' to prejudicial pretrial publicity about the defendant and the case that '[a]ny subsequent court proceedings in [that] community . . . [w]ould be but a hollow formality.'" *Id.* (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)); *see also* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

II.     **The biased analyses George cites give the Court no reason to depart from *Webster*.**

George attempts to avoid the inevitable conclusion that follows from the D.C. Circuit's precedent in *Webster*—that any possibility of jury bias can be addressed through voir dire—by citing to data that he claims would have altered the decision in *Webster* had it been presented there. *See* Mot. at 26. But two January 6 defendants have previously raised the exact same exhibits as George has filed in this case, and judges on this Court correctly denied both those defendants' motions to transfer venue. *See United States v. Johnson, et al.*, No. 21-cr-11, Minute Entry (D.D.C.

Mar. 12, 2024) (RJL) (denying motion to transfer venue citing same media analysis raised here); *United States v. Purdy, et al.*, No. 22-cr-19, Minute Entry (D.D.C. May 30, 2024) (RCL) (same).

Unlike the polls other defendants have consistently cited in January 6 venue motions, George relies on what he proclaims to be "cutting edge data" that "virtually eliminates the possibility for manipulation" that one would expect with polls. Mot. at 3. Both the reliance and the proclamation are incorrect. Courts have routinely rejected pre-voir dire polls and surveys as unpersuasive. *See e.g., United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005), *Haldeman*, 559 F.2d at 64, *United States v. Campa*, 459 F.3d 1121, *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009). The data provided by George suffers from issues almost identical to the ones that plague polls.  In order to reach their conclusions, the studies' authors made a series of assumptions about the relationship between responses and an individual's actual opinions that they do not and cannot substantiate.  Particularly given the lack of underlying data, the authorship, and the terms chosen, the conclusions of these studies raise questions about bias.

For the same reasons that courts often reject polling data, there are compelling reasons to rely on voir dire, rather the materials George submitted, when assessing whether prejudice should be presumed.  First, the material submitted by George lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions or search terms.  Second, just as surveys lack the formality that attends in-court proceedings under oath and do not afford the court the "face-to-face opportunity to gauge demeanor and credibility," *Skilling*, 561 U.S. at 395, so too the defense analysis lacks the kind of scrutiny and specificity that is needed to determine whether prejudice should be presumed.  Third, the material assumes that "media reach" – a term that the study does not define, but which seems to refer to the number of articles published on a topic – translates to intractable bias within the jury pool when present at

certain levels.  This conclusion relies on numerous questionable intermediate assumptions, such as the actual readership of media coverage and the ability of the media to actually influence prospective jurors, and the inability of jurors to set aside material they may have seen.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723.  Federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than outside material, and the defendant has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the materials presented when considering whether to presume prejudice.  And as explained below, the "data" submitted by the defendant does not support a presumption of prejudice in any event.

### A.    The Watchpost Media Bias analysis does not demonstrate pervasive prejudice in the District of Columbia.

George first relies on an analysis of media dissemination, across media markets, in a failed attempt to prove prejudice. *See* ECF No. 196-1. The seventy slides worth of graphics analyzing buzz words boil down to the same point: D.C. jurors are purportedly exposed to January 6 media coverage at a higher rate than anywhere else in the country, and that exposure ("reach") must equate to bias. Touting what he calls the "Meltwater data" (Mot. 5, 17), George claims this study proves potential juror bias and is trustworthy because it is free from manipulation. That claim is highly questionable given that the analysis of the Meltwater data was conducted by Watchpost, a company controlled by Brad Rukstales, who threw a chair at Capitol Police officers on January 6. *See Rukstales*, 21-cr-41 (CJN), ECF No. 130 at 5-6.

Beyond the glaring concerns surrounding the potentially biased source of this media bias report, there are substantive issues within the study data itself. Watchpost is a company that claims to be an expert in digital marketing, not juror media influence. Apparently, Watchpost's first foray into providing data relating to juries comes in the context of January 6. The study lacks sufficient context and explanation to be considered reliable and makes several unsubstantiated assumptions. And, in the end, the study cannot link media exposure to actual consumption and bias by D.C. jurors.

The first main issue with the study's data is that it is devoid of basic explanations and information that are essential to validating the work's reliability. There is no information on how the material was compiled by Meltwater and sourced by Watchpost. There are no calculations provided, such that the study's conclusions could be confirmed.  There is no information regarding how this study defined and measured "reach" beyond the generalities listed on slide 3. ECF No. 196-1 at 4. There is no explanation as to why the study includes North Dakota media consumption and not, say, an arguably comparable metro area. There is no demonstration that the "reach" of D.C.-based media outlets is limited to D.C. jurors. Many people from outside the district (especially those in the greater D.C. area) likely read about January 6 on local D.C. news sources. There is also no definition of 'local media' nor breakdown of what media is actually considered (newspaper, magazines, TV, online sources, social media, etc.) and what was not, nor does the study explain whether all instances of media reach – a two-paragraph online article or a 60-minute television episode – are treated similarly. For example, many Americans now get their news from social media feeds.  Is that a national or local news source?  Will it even be identified as a news source?  And despite seventy pages of slides, there is no actual proof that potential jurors have been reached, let alone influenced negatively or rendered unable to set aside their biases. To that

point, the term "media influence" is also misleading. Just because "local media" in D.C. may feature January 6 stories at a higher rate that other venues does not mean prospective jurors in D.C. are actually "influenced" by that media at a higher rate. There is no guarantee that any given potential juror is "influenced" by exposure to news stories, only a fraction of which the person may have heard or read. In the end, slide 6 (ECF No. 196-1 at 7) acknowledges that January 6 media mentions have declined in D.C., a fact that further weakens George's argument that potential D.C. jurors have been irreversibly influenced due to over-exposure.

Second, the study attempts to prove its point through assumptions rather than provable facts. These assumptions are crucial. For example, due to the "complicated" nature of converting "reach" into "viewership," Watchpost assumed that "2.5% of 'reach' is considered to be influential" (ECF No. 196-1 at 5 (Slide 4)) because "exact viewership of each article/mention. . . is outside the scope of this study." ECF No. 196-1 at 19 (Slide 18). But reliably discerning actual viewership is absolutely essential. The fact that PR agencies might (or might not) rely on a 2.5% "reach" for purposes of advertising does not guarantee it is a reliable estimate for purposes of venue litigation. Furthermore, on slide 16, Watchpost admits to manually recalibrating data to account for secondary domains. ECF No. 196-1 at 17. The study does not indicate whether the same manipulation was done for sources such as the Washington Post, that serve as both a local and national media source.

D.C.'s comparatively small population can also have a large impact on these numbers. The "reach" and "media influence" numbers were significantly higher in the Middle District of Florida than in D.C., but the calculated "media influence per potential juror" was higher in D.C. because the Middle District of Florida, according to this analysis, has more than 18 times as many potential jurors as D.C. ECF No. 196-1 at 25. And D.C. media reach is higher even on non-D.C.-specific

9

topics, such as hurricanes. *Id*. at 10-11 and 67-70. It seems that the D.C. market may simply have more media, with a smaller number of residents.  The "media influence per potential juror" calculation rests on at least two assumptions that have not been adequately established: (1) that the "reach" of D.C.-based sources was limited to D.C. residents (i.e., that residents elsewhere do not use what the study deems "local" D.C. news stories to read about events happening in D.C.) and (2) that potential jurors in D.C. and the Middle District of Florida viewed local January 6-related stories at the same rate (2.5% of total "reach"). This survey does not account for the reach of specific national media compared to local media. For example, the Middle District of Florida could consume January 6-related content from Fox News or CNN at a higher rate than D.C.; but it appears that stories in "national" sources are given an even distribution across the country.

The cracks become chasms when comparing D.C. to the D.C. Metro area (*see* ECF No. 196-1 at 20 and three examples below). It is hard to understand why there would be such a large discrepancy in media reach between two areas that share the same media market. It may simply be that there are fewer local news outlets in the D.C. metro area (compared with D.C.), while D.C. itself has a smaller population than the metro area.  And the study's conclusions do not comport with common sense: it cannot be that there is such a dramatic difference in bias between people living in D.C. and people living in the D.C. metro area.  This stark difference in results for the two relatively similar areas completely undermines the study's attempt to draw juror bias conclusions from this data.

The presence of local media is much higher in Washington, D.C. than elsewhere.  Most news about January 6 has come from national media.  In addition, local media in many parts of the country include syndicated national stories, so even "local media" includes national news and articles.

Beyond the national coverage, the local media in Washington, D.C. has had extensive influence when it comes to January 6.



| TOTAL | | All Search Terms | | | | | |
|---|---|---|---|---|---|---|---|
| | State | US | Washington, D.C. | DC Metro | FL Middle District | Florida | Dakotas |
| Total Media Influence | TMI (est) in MM | 150,642 | 616 | 2,788 | 5,926 | 10,651 | 646 |
| | Per Potential Juror | 792 | 1,451 | 845 | 764 | 774 | 773 |
| | Index | 55 | 100 | 58 | 53 | 53 | 53 |
| Local Media Influence | LMI (est) in MM | 16,781 | 317 | 464 | 463 | 959 | 58 |
| | % Local | 11% | 51% | 17% | 8% | 9% | 9% |
| | Per Potential Juror | 88 | 742 | 141 | 60 | 70 | 69 |
| | Index | 12 | 100 | 19 | 8 | 9 | 9 |

***Local media in D.C. for Jan 6 accounts for 51% of total media influence, compared to 11% nationally.***

The average potential juror has likely been exposed to 88 local media mentions since January 6, 2021.  In Washington D.C., it is 746.

*Graph from ECF No. 196-1 at 6 (slide 5) showing a large, unexplained gap in all terms between D.C. and D.C. Metro.*



*Graph from ECF No. 196-1 at 35 (slide 34) showing another large disparity in the term "1/6/21" between D.C. and D.C. Metro.*



*Graph from ECF No.196-1 at 55 (slide 54) showing another large disparity in the term "Proud Boys" between D.C. and D.C. Metro.*

In short, the Watchpost analysis methodology does not, in fact, revolutionize jury-pool analysis and escape the well-documented issues with polling, but simply draws from a different data source: terms appearing in unspecified media sources, rather than responses to survey questions. As such, George's data may be even less predictive of prospective jurors' opinions than survey data. The fact that certain search terms appeared with a particular frequency in a given jurisdiction says little about the actual influence of those terms on prospective jurors.

### B. The Google Trends analysis does not demonstrate pervasive prejudice in the District of Columbia.

Next George relies on Google search trends within the District of Columbia. *See* ECF No. 196-2. George argues that the high rate with which certain January 6 related buzz terms are Googled within D.C. demonstrates potential jurors are reached and therefore biased. The first main issue with this claim is that it presumes potential jurors are the ones "Googling" these buzz terms.

Google Trends can only show where and what topic is being searched, not who is searching for the topic. ECF No. 196-2 at 2. Reliance on Google Trends therefore fails to account for an important factor: D.C. is a massive transient hub. Every day, thousands of non-residents enter D.C. to attend school, work, or to site-see. Visitors within the District could be searching for terms related to January 6th while at work, at school, or while on a tour bus, driving up the Google Trend numbers. These visitors could double or even triple the amount of people using Google in D.C. on any given day; therefore, it skews the data relied upon by defense. The study fails to show that it is representative of the actual D.C. jury pool.

    Another major issue is that George incorrectly assumes that searched terms automatically create bias. Even if the Court is to assume that D.C. potential jurors have googled buzz words related to January 6 at a somewhat higher rate than other venues, it is a huge leap to conclude that such searches demonstrate entrenched bias. Much like the media bias analysis, the Google Trends data does not indicate what, if any, articles are even read, let alone absorbed. Furthermore, George's trends data focuses on words that are marginally, if at all, relevant to the actual evidence at George's trial, such as "white nationalist", "seditious conspiracy", and "Jan 6 Committee." George also ignores the infinite number of sources that may appear when a buzz term is Googled. Potential jurors have equal access to information from pro and anti-January 6 sources. George simply presumes the Googler is clicking on stories that would specifically bias a juror against a January 6 defendant. Voir dire is the function with which the Court can screen out any potential jurors who have been exposed to substantial pre-trial publicity and are unable to set aside any prejudices.

**C.**     **Implicit bias research does not demonstrate pervasive prejudice in the District of Columbia.**

George contends that voir dire is ineffective at addressing bias created from pretrial publicity. Mot. at 10, 14, and 19. George cites quotes from certain dated articles on implicit bias. ECF No. 196-3. Though none of these articles focuses on (or even mentions) the impact of implicit biases on jurors, George argues the mere fact that implicit biases exist creates an irrevocable harm that cannot be remedied by voir dire. Mot. at 10-12. These articles do not support the defendant's claim that a careful voir dire cannot ensure an impartial jury in this case – by, for example, asking questions designed to root out implicit biases of concern.

George's argument, moreover, is not specific to D.C.  If voir dire cannot correct for implicit bias in D.C., then it can do no better in the Middle District of Florida, where he would like to be tried.  George's point is that implicit bias is everywhere; he provides no indication that implicit biases are more or less extensive in his preferred district.  This undermines his request to move the trial elsewhere in search of a purportedly "less biased" pool.  George has not attempted to quantify or measure implicit bias in the District of Columbia compared to elsewhere. To adopt George's view of implicit biases, moreover, and the lack of remedy, would have radical implication on jury selection in any case where there is a claimed bias. To say implicit biases are everywhere and that a juror cannot put aside an implicit bias is to say there is no place for the jury process period. That is not the case.

The Supreme Court and the D.C. Circuit have long made clear that a careful voir dire is the appropriate way to address prejudicial pretrial publicity, except in those extreme cases where, unlike here, prejudice is properly presumed.  *See Skilling*, 561 U.S. at 381-82.  The Supreme Court observed in *Skilling* that voir dire was "well suited to th[e] task" of probing the crime's "widespread community impact."  *Id*. at 384.  And the Court has said that "[i]t is fair to assume

14

that the method we have relied on since the beginning"—*i.e.*, voir dire—"usually identifies bias." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807) (Marshall, C.J.)).  Similarly, the D.C. Circuit has said that "voir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner."  *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981); *see Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").  George's vague, general claims about implicit bias rendering voir dire ineffective cannot justify setting aside binding precedent holding otherwise.

Moreover, the Supreme Court has clearly indicated that the passage of time can reduce the prejudicial effect of pretrial publicity.  *See Skilling*, 561 U.S. at 383 ("[U]nlike cases in which trial swiftly followed a reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial."); *Patton*, 467 U.S. at 1034 ("That time soothes and erases is a perfectly natural phenomenon, familiar to all.").  Neither the articles about implicit bias nor the claims about media exposure supports a conclusion that such an extreme prejudice exists that potential biases cannot be addressed by voir dire.

### III.   The characteristics of the District of Columbia's jury pool do not support a change of venue.

George also contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.  Mot. at 17-21.  But January 6 is now over three years in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There

is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

As the *Webster* court noted, although "[w]e expect jurors to view significant criminal events in their hometown with an unapproving eye, whether it is the January 6th attack on the Capitol, a murder, or an armed robbery spree," such disapproval "says nothing about a juror's ability to be impartial in deciding whether a particular individual committed a crime or not." *Webster*, 102 F.4th at 480. Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.* In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.

IV. **The pretrial publicity related to January 6 does not support a presumption of prejudice in this District.**

A. **Nature and extent of January 6 pretrial publicity**

Next, George contends that a change of venue is warranted based on pretrial publicity against him, personally. Mot. at 22-23. But George has not pointed to one article that focuses on

16

his conduct from January 6, 2021, and he even admits that the media has not "branded" him. Instead, he contends the pretrial prejudice comes from this Court's evidentiary ruling in another case, which he claims "branded" him as a co-conspirator to the Proud Boy leadership defendants. *See United States v. Nordean, et al.*, No. 21-cr-175 (TJK), ECF No. 792. But that ruling simply referenced the relevance and admissibility of communications (the content of which was not published in the document) between the defendants in that case, George, and *twenty-one* named others. *See id.* at 3. George incorrectly presumes that a significant percentage of the public will navigate ECF, locate one documents amongst 937 filings (plus docket entries), connect the ruling to George, investigate the background behind the Court's ruling, differentiate George from the dozens of other individuals whose conduct was at issue, pay for the trial transcripts, read the thousands of pages of transcripts, and become biased. This is farfetched.

Focusing instead on pretrial publicity in the media, even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. And a comparatively small percentage of the news coverage of January 6 has focused on George himself.[4] In *Webster*, the D.C. Circuit focused on the publicity the specific defendant, not January 6 as a whole, received. *Webster*, 102 F.4th at 479-80. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 1000 people. The

---

[4] George has not pointed to a single article that focuses on his conduct from January 6, 2021. A Google search of "Eddie George" does not even result in the Defendant as a top result. And while a Google search of "Eddie George January 6" does bring up an article from the Washington Post dated July 16, 2024, that article primarily addressed the government's filing opposing a trial continuance in this case and its stated plans to *drop* a charge to avoid further delay. *See* https://www.washingtonpost.com/dc-md-va/2024/07/16/jan-6-defendants-obstruction-charges-drop/.

Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt, just as Judge Mehta did in *Webster*. *Webster*, 102 F.4th at 482 (describing that *voir dire* as a "searching inquiry").

In any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).

**B.      Passage of time before trial**

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  In this case, 44 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724.  In *Webster,* the D.C. Circuit was unpersuaded by defendant's claim about the passage of time—and there, only 12 months had elapsed, far less than the time here. *Webster,* 102 F.4th at 481.

Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned George, and much of the reporting has been national is scope, rather than limited to Washington, D.C.  Thus, like Webster, George "puts the cart before the

horse: He must first show prejudice before arguing that the prejudice did not dissipate. He has failed to do so." *Webster,* 102 F.4th at 481.

### C.    The jury verdicts in other January 6 cases.

George notes that his trial "has not begun, much less concluded." Mot. at 24. Therefore, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.   But the fact that *Skilling* considered this factor to be "of prime significance," *id*., underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

George suggests that this factor actually supports his claim of prejudice because many other jury trials involving January 6 defendants have resulted in prompt unanimous guilty verdicts.  Mot. at 24-25. But although *Skilling* indicated that a split verdict could "undermine" a presumption of prejudice, it never suggested that a unanimous verdict—particularly a unanimous verdict in a separate case involving a different defendant—was enough to establish prejudice.  The prompt and unanimous guilty verdicts in many other January 6 jury trials resulted from the strength of the government's evidence, not undue prejudice.

### V.    A change of venue is not warranted based on convenience or the interest of justice.

Last, George argues that this Court should transfer venue to the Middle District of Florida. Mot. at 26. Such a motion would fall under Rule 21(b), which allows transfer to another district "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). George asserts that a change in venue would allow for the trial to be in "a

more convenient location for some participants," apparently to include agents who arrested his co-defendants (who have since pled guilty) who reside there, and that he cannot receive a fair trial in the District of Columbia. Mot. at 26-27. These arguments do not support a transfer of venue under Rule 21(b).

"There is a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (quoting *United States v. Baltimore & Ohio R.R.*, 538 F. Supp. 200, 205 (D.D.C. 1982)). That presumption is rooted in the Constitution, which states that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. And it is reflected in the Federal Rules of Criminal Procedure, which state that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. To obtain a change of venue under Rule 21(b), a defendant must demonstrate that trial in the district where the crime occurred "would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome." *Bowdoin*, 770 F. Supp. 2d at 138 (quotations marks omitted). Factors a court considering a motion to transfer venue are:

> (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district of division involved; and (10) any other special elements which might affect the transfer.

*Id.* at 137-38. Those factors strongly support keeping the prosecution in this District. The events at issue took place in the District of Columbia, and the witnesses and evidence are in this District. Holding a trial in the Middle District of Florida would require a significant expenditure of government funds for the prosecution team and witnesses to travel to that district.

Moreover, none of the defendant's reasons for transfer under Rule 21(b) supports an interest of justice transfer.  Even assuming that a trial in the Middle District of Florida would somehow be more convenient for the defendant, who now resides in North Carolina, *see* ECF No. 152 (or, for that matter, his counsel, who resides in a different district in Florida), that fact alone is not sufficient to justify transfer, particularly considering that the defendant chose to travel to Washington, D.C. to commit his crimes at the U.S. Capitol.

The defendant's claim that venue should be transferred under Rule 21(b) because the Middle District of Florida would provide him with a fairer jury pool, Mot. at 27, is similarly unavailing.  As explained above, the defendant cannot obtain a change of venue based on prejudicial publicity under the constitutional standard or Rule 21(a).  And the defendant cannot use Rule 21(b)'s "interest of justice" standard as an alternative way to raise a claim of "local community prejudice." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).  In *Jones*, the D.C. Circuit denied a petition for mandamus which challenged the presiding judge's denial of his motion to transfer under Rule 21(b) based on a claim of prejudicial publicity.  *Id.* at 1234, 1238-39.  The court of appeals held "that the standard of Rule 21(a) is the exclusive gauge by which circumstances of that character (prejudice) are to be measured." *Id.* at 1239.  The defendant has failed to establish that he cannot receive a fair trial in this District, and the defendant has failed to articulate a basis for transfer under Rule 21(b).

## VI. The January 6-related jury trials that have already occurred have demonstrated the availability of a significant number of fair, impartial jurors in the D.C. venire.

At this point, dozens of January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of

impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). The D.C. Circuit affirmed the adequacy of this *voir dire* process in *Webster. Webster,* 102 F.4th at 482.

Judges presiding over nearly all of the January 6 trials have been able to select a jury in one or two days. Moreover, juries in some January 6 trials have either been unable to reach a verdict on certain counts, *see United States v. Williams*, No. 21-cr-618; *United States v. Gillespie* (22-cr-60), or have acquitted on some counts, *see United States v. Rhodes, et al*., No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2020); *United States v. Alexander Sheppard* (21-cr-203), *United States v. Vitali Gossjankowski* (21-cr-123), *United States v. Kenneth Thomas* (21-cr-552), *United States v. Ralph Celentano* (22-cr-186). Of particular note, even the jury trying the leaders of the Proud Boys acquitted on certain counts – and deliberated for approximately 10 days. *Nordean, et al.*, (21-cr-175), Minute Entry (D.D.C May 4, 2023). These cases clearly demonstrate that fair and impartial juries are available in the District of Columbia.

## **CONCLUSION**

George's request for a venue transfer is without merit. The Court should deny George's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:     /s/ *Monika (Isia) Jasiewicz*
        JASON B.A. MCCULLOUGH
        DC Bar No. 998006; NY Bar No. 4544953
        ALEXIS J. LOEB
        CA Bar No. 269895

MONIKA (ISIA) JASIEWICZ
DC Bar No. 1024941
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
(202) 252-7233
jason.mccullough2@usdoj.gov